U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described**.

**Signed April 8, 2010**                                      **United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| FRANK J. CRUMLEY and | § | CASE NO. 09-30825-BJH-7 |
| JENNIFER CRUMLEY, | § | |
| | § | |
| | § | |
| Debtors. | § | |

---

| | | |
|---|---|---|
| BENCHMARK BANK, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ADVERSARY NO. 09-3215-BJH |
| | § | |
| FRANK J. CRUMLEY and | § | |
| JENNIFER CRUMLEY, | § | |
| | § | |
| Defendants, | § | |

### <u>MEMORANDUM OPINION</u>

Before the Court is the First Amended Complaint Objecting to Discharge (the "Complaint")

filed by Benchmark Bank ("Benchmark") against Frank J. and Jennifer Crumley (collectively, the "Debtors"), which requests that the Court deny the Debtors' discharge pursuant to 11 U.S.C. §§ 727(a)(2)(B), 727(a)(3), 727(a)(4)(A), and 727(a)(5). Trial was commenced on March 8, 2010, and continued and concluded on March 10, 2010. The Court has core jurisdiction over the Complaint under 28 U.S.C. §§ 1334 and 157(b)(2)(J). This Memorandum Opinion and Order contains the Court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I.    FACTUAL BACKGROUND

The facts in this case are largely undisputed. The Debtors filed a voluntary petition under Chapter 7 on February 6, 2009, thereby commencing this bankruptcy case (the "Case"). The Debtors later filed Schedules A through J, Official Form 7 (the "Original Statement of Financial Affairs" or "Original SOFA"), Official Form 8 (the "Original Statement of Intention"), and Official Form 22A (the "Statement of Current Monthly Income") on February 10, 2009. On Schedule D, the Debtors listed Benchmark as a creditor with a non-contingent, liquidated, and undisputed claim for $1,534,932.97, secured by real property located at 6738 Preston Shire, Dallas, Texas (the "Preston Shire Property"). Benchmark timely filed an objection to discharge–*i.e.*, the Complaint, on July 10, 2009, which initiated this adversary proceeding. On August 24, 2009, the Debtors amended Official Form 7 and Official Form 8 (respectively, the "Amended SOFA" and the "Amended Statement of Intention"). Benchmark filed an Amended Complaint by leave of the Court on March 4, 2010.

At the time of their bankruptcy filing, Frank J. Crumley ("Mr. Crumley") was a loan officer employed by PrimeLending, while Jennifer Crumley ("Mrs. Crumley") worked as a media consultant. The Debtors kept a joint savings account and separate checking accounts at Bank of

America, and maintained investment accounts, including brokerage and individual retirement accounts ("IRAs"), through Ameriprise Financial Services, Inc. ("Ameriprise").

In 2003, Mr. Crumley entered into a general partnership with Knox Custom Homes, Inc. ("Knox Custom Homes"), named Crumley Hall Investments, J.V. ("Crumley Hall Investments").[1] Pl.'s Ex. 50, at CRUMLEY 06301. Along with Knox Custom Homes, Mr. Crumley built a home at 6223 Lavendale (the "Lavendale Property"), which was sold in 2006 for a profit. Pl.'s Ex. 35, at CRUMLEY 02385; CRUMLEY 02395 (Debtors' 2006 income tax return and workpapers). Mr. Crumley also entered into a loan with Benchmark for the purchase of a lot and construction of a home on the Preston Shire Property. Pl.'s Ex. 54 (Mr. Crumley deposition), at 77:2 - 78:25.[2] Knox Custom Homes was the contractor for the home to be built on the Preston Shire Property. *Id.* Knox Custom Homes abandoned the project before the home was complete, however, which left the Debtors to finish it on their own. Pl.'s Ex. 54, at 80:9 - 82:9; Pl.'s Ex. 54, at 77:2 - 25. The Debtors asserted that the difficulties with the Preston Shire Property and the Debtors' attempts to fund the home's completion, along with a reduction in their income, ultimately led to their bankruptcy filing. Pl.'s Ex. 7, at 4; Pl.'s Ex. 8, at 4.

## II. LEGAL ANALYSIS

As noted above, Benchmark objects to the Debtors' discharge under several provisions of 11 U.S.C. § 727(a). Objections to discharge are to be construed liberally in favor of the debtor and

---

[1] The joint venture agreement expressly states that the parties "voluntarily associate[d] themselves as a general partnership," although Mr. Crumley testified that he "envisioned" the association as a joint venture. Pl.'s Ex. 50, at CRUMLEY 06301 §1.2; Audiotape: Trial conducted 3/10/10 at 9:17:21 – 9:17:34 (on file with Court). Ultimately, the precise nature of the legal relationship is not at issue here.

[2] Benchmark introduced the depositions of Mr. and Mrs. Crumley (Pl.'s Exs. 54 and 55, respectively) into evidence. Hereinafter, the Court will cite deposition testimony by referencing the exhibit number, followed by the page number of the deposition, followed by the line reference. Thus, the citation above references Mr. Crumley's deposition, from page 77, line 2 to page 78, line 25.

strictly against the creditor in accord with the policy of providing a "fresh start" to the debtor. 11

U.S.C. § 727(c)(1); *In re DeVoll*, 266 B.R. 81, 97 (Bankr. N.D. Tex. 2001). The party objecting to

discharge bears the burden to prove all elements of its claims by a preponderance of the evidence.

*Id*. (citing *Grogan v. Garner*, 498 U.S. 279 (1991)); FED. R. BANKR. P. 4005. Because the bulk of

Benchmark's case involves alleged false oaths made by the Debtors, the Court will first consider

Benchmark's claims under § 727(a)(4)(A) before addressing its remaining claims.

### A. 11 U.S.C. § 727(a)(4)(A)

Section 727(a)(4)(A) provides that a discharge should be denied if "the debtor knowingly and

fraudulently, in or in connection with the case ... made a false oath or account." A false statement

or omission in a debtor's schedules or made by the debtor at an examination during the course of

the bankruptcy proceedings can be a false oath sufficient to justify the denial of a discharge.

*Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992). To prevail on this

claim, the creditor has the burden of proving that (i) the debtor made a statement under oath; (ii) the

statement was false; (iii) the debtor knew the statement was false; (iv) the debtor made the statement

with fraudulent intent; and (v) the statement related materially to the case. *Id.; see also Sholdra v.*

*Chilmark Fin. Ltd. Liab. P'ship (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001).

The purpose of § 727(a)(4)(A) is to ensure that debtors provide sufficient reliable information

to those with an interest in the debtor's affairs, since complete disclosure is essential to the proper

administration of the bankruptcy estate. *See, e.g., In re Sicari*, 187 B.R. 861, 870 (Bankr. S.D.N.Y.

1994). Because the accuracy and completeness of information is so essential, "[i]n determining

whether an omission is material, the issue is not merely the value of the omitted assets or whether

the omission was detrimental to creditors. The subject matter of a false oath is 'material,' and thus

sufficient to bar discharge if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *In re Beaubouef*, 966 F.2d at 177.

Each of the Debtors' alleged misstatements and omissions were made under oath, and thus Benchmark has established that element of its claim. *See* Pl.'s Ex. 5, at 7; Pl.'s Ex. 2, at 6; Pl.'s Ex. 1, at 23; Pl.'s Ex. 53, at 3. Because of the sheer number of allegations that Benchmark has put forward, however, the Court will analyze the falsity and materiality of each purported misstatement or omission individually, and then separately consider the issues of knowledge of falsity and fraudulent intent.

### 1. Alleged Misstatements and Omissions

Benchmark asserts that the Debtors made the following false statements or omissions in their petition, in their supporting schedules, or in other statements made during the bankruptcy proceeding:

### a. SOFA and Amended SOFA

(i) Question 18 of the SOFA directed the Debtors to

list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partnership, sole proprietorship, or was a self-employed professional within the six years immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within the six years immediately preceding the commencement of this case.

In response to the question, the Debtors listed only one entity, BJC, LLP, which was described as having no activity. Pl.'s Ex. 2, at 5. On the Amended SOFA, the Debtor's disclosed an additional interest in a non-profit corporation, the Texas Irish Cycling Team, Inc. Pl.'s Ex. 5, at 5. The Debtors

did not disclose Mr. Crumley's interest in Crumley Hall Investments on either the SOFA or the Amended SOFA. Because Crumley Hall Investments was formed on July 28, 2003, within the six-year period preceding commencement of the Case, this interest clearly should have been disclosed in response to Question 18. Pl.'s Ex. 50, at CRUMLEY06301; *see also* Pl.'s Ex. 53, at 2-3 (case commenced on February 6, 2009).[3] Further, this omission is material, since the failure to disclose an ownership interest in even a worthless company bears a direct relationship to the debtor's estate and business transactions. *In re Beaubouef*, 966 F.2d at 178.

Similarly, the Debtors did not disclose any business relationship with any party in connection with the Preston Shire Property. *See* SOFA and Amended SOFA. At trial, however, Mr. Crumley testified that his father, Frank E. Crumley ("Mr. Crumley, Sr."), invested an initial deposit of $80,000.00 into a Certificate of Deposit with Benchmark in connection with the Preston Shire Property, in return for a 30% share of the profits when the property was sold. Audiotape: Trial conducted 3/8/10 at 2:33:43 – 2:34:27 (on file with Court). In a letter to Mr. Crumley, Sr., dated June 10, 2006,[4] Mr. Crumley confirmed the terms of this arrangement. Pl.'s Ex. 52.[5] Specifically, the letter states "[t]his letter is to state the nature of our business arrangement concerning the building of [the Preston Shire Property]" and is signed "Frank J. Crumley." *Id.*

---

[3] At trial, Mr. Crumley testified that there were possibly separate joint venture agreements for the Lavendale and Preston Shire Properties, but that he was not certain of the particular arrangements, and that the Crumley Hall Investments agreement could have stood for both projects. Audiotape: Trial conducted 3/10/10 at 9:18:06 – 9:18:28 (on file with Court). Certainly, Benchmark produced no evidence of any separate agreement, and thus, to the extent any other partnership or joint venture did exist, Benchmark has failed to carry its burden of proof.

[4] Mr. Crumley testified that the letter was actually prepared post-petition, and that he dated the letter on the day that he recalled that the conversation with his father had occurred. Audiotape: Trial conducted 3/8/10 at 2:35:20 – 2:35:51 (on file with Court). Even assuming June 10, 2006 is the relevant date, it still falls within the six-year look-back period required by Question 18.

[5] In 2008, Mr. Crumley, Sr. also began making a series of gifts to Mr. Crumley to enable Mr. Crumley to make interest payments on the Preston Shire Property. Audiotape: Trial conducted 3/10/10 at 9:09:39 – 9:10:41 (on file with Court). These gifts are discussed at pp.11-12 *infra*.

The definitions provided in the instructions to Official Form 7 (the Statement of Financial Affairs) provide that an individual debtor "may be 'in business' for the purpose of [the Statement of Financial Affairs] if the debtor engages in a trade, business, or other activity, other than as an employee, to supplement income from the debtor's primary employment." *See* Official Form 7: Statement of Financial Affairs, at 1. This definition of "in business" includes associations such as that between Mr. Crumley and Mr. Crumley, Sr. with regard to the Preston Shire Property, and thus should have been disclosed in response to Question 18. As with the failure to disclose Crumley Hall Investments, this omission is material. *In re Beaubouef*, 966 F.2d at 178.

(ii)    Question 19(a) of the SOFA directed the Debtors to disclose the names of all bookkeepers and accountants who kept or supervised the keeping of books of account and records of the Debtors within two years preceding the filing of the Case, while Question 19(c) directed the Debtors to identify any firms or individuals who were in possession of the Debtors' books of account or records at the commencement of the Case. The Debtors indicated "None" to these questions on both the SOFA and the Amended SOFA. Pl.'s Ex. 2, at 5; Pl.'s Ex. 5, at 5.

In their later respective discovery responses, however, the Debtors listed three persons who supervised the keeping of books and accounts during the five years prior to the commencement of the Case: Robert Fenske, Dean Marth, and D.L. Long. Pl.'s Ex. 7, at 3; Pl.'s Ex. 8, at 3. Of these three persons, Benchmark presented evidence that only one, D.L. Long, was the Debtors' accountant in the two years prior to the commencement of the Case. *See* Pl.'s Exs. 31 & 33 (2008 and 2007 individual income tax returns prepared by D.L. Long); Pl.'s Ex. 34 (2005 individual income tax return prepared by Dean Marth); Pl.'s Ex. 54, at 56:11 - 25 (Mr. Crumley's deposition testimony that Robert Fenske performed accounting services in 2002 and 2003). Thus, the Debtors should have

disclosed D.L. Long in answer to Question 19(a). *See Wildlife Farms II, Ltd. Liab. Co. v. Robinson (In re Robinson)*, 368 B.R. 818 (Bankr. E.D. Ark. 2007) and *Hunerwadel v. Dulock (In re Dulock)*, 250 B.R. 147, 157 (Bankr. N.D. Ga. 2000) (accountants and tax preparers required to be disclosed on Statement of Financial Affairs); *accord Cadle Co. v. Preston-Guenther (In re Guenther)*, 333 B.R. 759, 767-68 (Bankr. N.D. Tex. 2005) (name of accountant who helped complete schedules was material omission). Because the identity of accountants bears a relationship to the Debtors' estate, this omission was material. *See In re Guenther*, 333 B.R. at 768.

Similarly, the Debtors identified these same three persons in response to an interrogatory from Benchmark requesting that they identify all books and records "in the possession, custody, or control" of the Debtors that could "construct[ ] an accurate picture of [the Debtors'] financial history for the five years" before the petition date. Pl.'s Ex. 7, at 3; Pl.'s Ex. 8, at 3.[6] Accordingly, Benchmark asserts that the Debtors should have disclosed these persons in response to Question 19(c). Similarly, Benchmark asserts that the Debtors should have listed their personal financial advisor, Ky Fiser, in response to question 19(c) because Fiser had control and custody of records relating to the Debtors' various investment accounts with Ameriprise, Fiser's employer. Audiotape: Trial conducted 3/8/10 at 2:05:39 – 2:10:02 (on file with Court).

The Court disagrees. Question 19(c) specifically requires disclosure of persons or entities who have possession of records that belong to–not that simply pertain to–the debtor. *See* Official Form 7 Question 19(c) ("List all firms or individuals who at the time of the commencement of this case were in possession of **the** books and records **of the debtor**.") (emphasis added); *see also In re*

---

[6] It is unclear exactly why the Debtors indicated the names of persons, rather than books or records as requested, in response to this interrogatory. *See* Pl.'s Ex. 7, at 3; Pl.'s Ex. 8, at 3.

*Gartner*, 326 B.R. 357, 370-71; 377 (Bankr. S.D. Tex. 2005) (failure to disclose records belonging to the debtor but held by third parties was false oath). Significantly, the scope of Question 19(c) is narrower than that of the interrogatory posed by Benchmark to the Debtors, in that Question 19(c) does not require the debtor to identify books or records of others that the debtor may nonetheless access or control. *Compare, e.g.,* Pl.'s Ex. 5, at 5 (Amended SOFA) with Pl.'s Ex. 7, at 3 (interrogatory to Mr. Crumley). Benchmark presented no evidence that these parties held any records or books of account that actually belonged to the Debtors, but rather that the accountants and the financial advisor had their own records that simply contained information about the Debtors' affairs or, at best, that they possessed copies of records also held by the Debtors. Audiotape: Trial conducted 3/8/10 at 2:08:42 – 2:08:55 (on file with Court) (Ameriprise retained copies of monthly statements provided to Debtors); Pl.'s Ex. 54, at 57:23 - 58:1 (Mr. Crumley's deposition testimony that tax and accounting records produced were in his possession). Thus, the Court finds that the Debtors made no misstatement or omission in connection with Question 19(c).

(iii) Question 2 of the SOFA directed the Debtors to state the amount of income received other than from employment, trade, profession, or operation of a business in the two years prior to the commencement of the Case. On both the SOFA and the Amended SOFA, the Debtors disclosed taxable interest of $8,933.00 for 2007, and IRA distributions of $20,000.00 for 2007 and $140,000.00 for 2008. Pl.'s Ex. 2, at 1; Pl.'s Ex. 5, at 1. Benchmark asserts that the Debtors failed to disclose as income under this section: (1) interest paid by Benchmark in 2008; (2) funds received from Mr. Crumley, Sr. as gifts during 2008; (3) a cash advance or loan from Michael Inkman; (4) funds

withdrawn from the Debtors' childrens' custodial accounts; and (5) funds withdrawn from Mr. Crumley's brokerage account with Ameriprise.[7]

The Instructions to Official Form B7 (Statement of Financial Affairs) provide that, for purposes of Question 2, income "may include, but is not limited to, income from tax refunds, Social Security and other public benefit payments, alimony, child support, interest, dividends, pensions, annuities, capital gains, money judgments from lawsuits, royalties, licenses, rents, leases, and subleases." Instructions, Official Form B7 at 2, available at http://www.uscourts.gov/bkforms/bankruptcy_forms.html#official. The inclusion of items such as income tax refunds and child support payments make it clear that "income" for purposes of Question 2 is intended to reach many distributions beyond the scope of gross income as defined by the Internal Revenue Code. *Cadle Co. v. King (In re King)*, 272 B.R. 281, 292 (Bankr. N.D. Okla. 2002); *see also* 26 U.S.C. § 71(c)(1) (2009) (child support payments are excluded from gross income). As listed in the Instructions, the scope of Question 2 is consistent with the legal definition of "income" as receipts "from employment, business, investments, royalties, gifts, and the like." *See* BLACK'S LAW DICTIONARY 831 (9th ed. 2009). The definition of income does not include the corpus of assets and investments, however, but only the interest or profit realized on the principal value of such items. *Zahn v. Fink (In re Zahn)*, 391 B.R. 840, 845 (B.A.P. 8th Cir. 2008).

The Court will address each of the alleged omissions under this standard. Clearly, any omission of income from a debtor's statements is material. *In re Beaubouef*, 966 F.2d at 178.

---

[7] Benchmark's arguments with respect to the Debtors' alleged failures to report income in response to Question 2 were extremely disjointed and poorly organized. The Court has attempted to glean and summarize Benchmark's arguments on this issue from the record of its response to the Debtors' oral motion for a directed verdict and from its closing argument. Audiotape: Trial conducted 3/8/10 at 4:54:53 – 5:16:38 (on file with Court); Audiotape: Trial conducted 3/10/10 at 10:37:12 – 11:06:18 (on file with Court).

Interest from Benchmark: The Debtors received $7,017.41 in interest income from Benchmark for 2008. Pl.'s Ex. 32, at CRUMLEY03008 (2008 1099-INT). This amount should have been disclosed in response to Question 2, and is material.

Funds received from Mr. Crumley, Sr.: Mr. Crumley testified that in 2008, after Knox Custom Homes abandoned work on the Preston Shire Property, Mr. Crumley, Sr. began making a series of gifts that were deposited into Mr. Crumley's bank account that were used to pay interest on the Benchmark loan. Audiotape: Trial conducted 3/10/10 at 9:09:31 – 9:10:45 (on file with Court). The exact amount of such gifts that Mr. Crumley, Sr. made during 2008 is unclear from the record, but the total appears to be at least $50,000.00, and could be as much as approximately $84,000.00. *See* Pl.'s Ex. 54 (deposition of Mr. Crumley), at 35:10 - 20.[8] Mr. Crumley's testimony was often inconsistent as to the timing and nature of these payments, which he alternately described as gifts and loans. *Compare* Pl.'s Ex. 54, at 35:10 - 20 *with* Audiotape: Trial conducted 3/10/10 at 9:09:31 – 9:10:45 (on file with Court). Further, at trial, Mr. Crumley at first retreated from his deposition testimony on this point, and claimed that he had received only $15,000.00 in gifts from his father from December 2008 through the filing of the petition. Audiotape: Trial conducted 3/8/10 at 1:36:05 – 1:43:08 (on file with Court). After being confronted with a significant discrepancy between his reported sources of income and the total deposits to his bank account during 2008, however, Mr. Crumley reversed himself once again, and testified that he must have in fact begun receiving gifts from Mr. Crumley, Sr. in January 2008. Audiotape: Trial conducted 3/8/10 at 4:06:23

---

[8] At trial, Benchmark demonstrated that at least $84,248.12 of funds were deposited into Mr. Crumley's checking account that could not be identified as Mr. Crumley's salary, as withdrawals from the Debtors' Ameriprise accounts, or as tax refunds received during 2008. Audiotape: Trial conducted 3/8/10 at 3:45:43 - 4:10:02 (on file with Court); Pl.'s Ex. 11 at CRUMLEY03921 - CRUMLEY03922; Pl.'s Ex. 56. Mr. Crumley testified that a portion of these funds could have been withdrawals from his Ameriprise brokerage account, since he received some distributions from that account as checks rather than wire transfers. Audiotape: Trial conducted 3/8/10 at 4:07:05 - 4:08:23 (on file with Court).

**Memorandum Opinion** 11

– 4:11:01 (on file with Court); Audiotape: Trial conducted 3/10/10 at 9:09:31 – 9:10:45 (on file with Court). In explanation, Mr. Crumley stated that prior to trial he had never attempted to reconcile the deposits made to his bank account during 2008 with the sources of his income for that year. Audiotape: Trial conducted 3/10/10 at 9:08:35 – 9:09:14 (on file with Court).

Regardless of their actual amount, the gifts made by Mr. Crumley, Sr. during 2008 should have been listed in response to Question 2. The situation here is similar to the facts in *King*, where the debtor did not disclose a series of payments from business associates that the debtor described as "loans or gifts from friends that were intended to help him through a difficult financial period." *See In re King*, 272 B.R. at 292. As noted above, omissions of income are material. *In re Beaubouef*, 966 F.2d at 178.

<u>Advance from Inkman</u>: In December 2008, Mr. Crumley received what he characterized as an advance against his future commissions of $5,000.00 from Michael Inkman ("Inkman"), Mr. Crumley's supervisor at PrimeLending. Audiotape: Trial conducted 3/8/10 at 11:06:02 – 11:06:55 (on file with Court). However, Mr. Crumley did not schedule Inkman as a creditor, nor did he list the $5,000.00 obligation as a debt on Schedule F. Audiotape: Trial conducted 3/8/10 at 11:08:03 – 11:08:24 (on file with Court). Even though the funds came from Inkman personally, Mr. Crumley testified that he did not list the obligation as a debt because he viewed it solely as an advance on commissions that he had earned. *See* Pl.'s Ex. 36 ($5,000.00 repayment check from Mr. Crumley to Michael Inkman); Audiotape: Trial conducted 3/8/10 at 3:13:41 – 3:14:45 (on file with Court). Benchmark did not dispute this characterization, but rather, at trial, asserted that the $5,000.00 advance should have either been disclosed as income, or that Inkman should have been listed as a

creditor.  *See* Audiotape: Trial conducted 3/8/10 at 5:06:16 – 5:06:47 (on file with Court) and Audiotape: Trial conducted 3/10/10 at 10:51:06 – 10:51:51 (on file with Court).

Salary advances are normally construed as income rather than true loans, since the employee is primarily expected to satisfy the obligation through future services.  *In re Killian*, 422 B.R. 903, 911 (Bankr. N.D. Ill. 2009).  Here, however, the record shows that the funds were advanced by Inkman personally, rather than by PrimeLending, Mr. Crumley's employer.  *See* Pl.'s Ex. 36.  Thus, the advance was no more than a personal loan, even though there may have been an understanding that the debt would be repaid from Mr. Crumley's future commissions.  Accordingly, although the loan proceeds were not required to be disclosed as income, Mr. Crumley should have listed Inkman as a creditor.  This omission is material.  *See, e.g., In re Warr*, 410 B.R. 891, 896-97 (Bankr. D. Idaho 2009) (describing failure to list personal loans as material).

Funds withdrawn from custodial accounts:  In 2007, Mr. Crumley withdrew $37,000.00 from two accounts in the name of his children for which he was custodian under the Texas Uniform Transfers to Minors Act (the "TUTMA").  Pl.'s Ex. 48, at CRUMLEY05609 ($18,400.00 withdrawal) and CRUMLEY 05612 ($18,600.00 withdrawal).  In 2008, Mr. Crumley withdrew $1,500.00 from these accounts.  Pl.'s Ex. 47, at CRUMLEY05505 ($800.00 withdrawal) and CRUMLEY05507 ($700.00 withdrawal).  Mr. Crumley testified that, at least as to the amounts withdrawn in 2007, these funds were used either to pay expenses on the Preston Shire Property or for the Debtors' living expenses.  Audiotape: Trial conducted 3/10/10 at 10:04:54 – 10:05:18 (on file with Court).

Custodial assets under TUTMA are the property of the child, rather than the parent.  TEX. PROP. CODE ANN. § 141.012(b) (Vernon 2007) ("A transfer made under § 141.010 is irrevocable, and the custodial property is indefeasibly vested in the minor.").  Under TUTMA, however, a custodian

"may expend for the minor's benefit as much of the custodial property as the custodian considers advisable for the use and benefit of the minor ..." TEX. PROP. CODE ANN. § 141.014(a) (Vernon 2007). In this respect, distributions from TUTMA accounts are similar to child support payments received by a custodial parent. *See Farish v. Farish*, 982 S.W.2d 623, 627 n.2 (Tex. App. 1998) (child support payments are properly characterized as related to the care and welfare of the child, not for the benefit of the parent). As noted previously, child support payments–even though excluded from gross income for income tax purposes–must be disclosed in response to Question 2 of the SOFA. *In re King*, 272 B.R. at 292; 26 U.S.C. § 71(c)(1). Thus, by analogy, the Court finds that these withdrawals fall within the expansive definition of income required by Question 2, to the extent used for the benefit of the Debtors' children. To the extent the funds were not used for the benefit of the children, *e.g.*–for the Preston Shire Property, these withdrawals also fall under the broad scope of income contemplated by Question 2, in the same vein as income received from Mr. Crumley, Sr. *See In re King*, 272 B.R. at 298. These omissions are material.

Funds withdrawn from Mr. Crumley's brokerage account: In 2008, Mr. Crumley withdrew $23,946.57 from his brokerage account with Ameriprise. Pl.'s Ex. 47, at CRUMLEY05493. Similarly, in December 2007, Mr. Crumley withdrew $12,000.00 in cash from this account.[9] Pl.'s Ex. 45, at CRUMLEY05841. Benchmark presented no evidence that the monies in these accounts were anything other than the Debtors' personal savings. Because the corpus of savings accounts are not considered income, the Debtors were not required to disclose these withdrawals in response to Question 2. *See In re Zahn*, 391 B.R. at 845.

---

[9] The total withdrawals from the account during 2007 equaled $41,530.17. However, the detail of the account shows that only one cash withdrawal occurred within the two-year scope required by the SOFA (two years prior to February 2009). The remaining withdrawals within the applicable scope were transfers to other Ameriprise accounts held by the Debtors. Pl.'s Ex. 45, at CRUMLEY05841.

(iv) Question 3 of the SOFA directed the Debtors to disclose payments for installment purchases of goods or services of over $600.00 made within 90 days of the commencement of the Case. On the SOFA and Amended SOFA, the Debtors omitted monthly payments to Blue Cross/Blue Shield of $731.00 for health insurance that should have been disclosed in response to this question. Audiotape: Trial conducted 3/8/10 at 11:30:21 - 11:31:14 (on file with Court); Pl.'s Ex. 11, at CRUMLEY03925. The Debtors should also have included regular monthly payments of $1,401.07 made to Ameriprise for their life insurance policies and investment advisory fees. Audiotape: Trial conducted 3/8/10 at 11:26:33 - 11:30:21 (on file with Court). As with income, omissions or misstatements of expenses are material because of their direct relationship to the disposition of the debtor's property. *See In re Beaubouef*, 966 F.2d at 178.

(v) Question 14 of the SOFA instructed the Debtors to list all property owned by another person that the Debtors held or controlled. The Debtors listed "None" on both the SOFA and the Amended SOFA. Pl.'s Ex. 2, at 4; Pl.'s Ex. 5, at 4. As of the petition date, however, Mr. Crumley was the custodian of two separate brokerage accounts through Ameriprise for the benefit of his two children under TUTMA. Pl.'s Ex. 46, at CRUMLEY05716 & CRUMLEY05718; Pl.'s Ex. 47, at CRUMLEY05505 & CRUMLEY05507. Accordingly, the Debtors should have disclosed the existence and value of these accounts in response to Question 14. At the filing of the petition, these accounts collectively contained $91.14. *See* Pl.'s Ex. 46, at CRUMLEY05716 & CRUMLEY05718; Pl.'s Ex. 47, at CRUMLEY05505 & CRUMLEY05507. This information, however, bears no relationship to the existence or disposition of any property of the Debtors, and thus the Court finds that the omission was not material. *See Cadle Co. v. Pratt*, 411 F.3d 561, 568 (5th Cir. 2005)

(debtor's failure to disclose that he was trustee of trusts established for his children was not material).

### b.      Petition and Supporting Schedules

(i)  On the joint petition, Mrs. Crumley recorded her name as "Crumley, Jennifer" and listed no other names used in the previous eight years.  Pl.'s Ex. 53, at 1.  The Debtors were married in 1998, and Mrs. Crumley testified that for the first years of their marriage she kept her maiden name of Jascott, before changing her name to "Jennifer Jascott Crumley."  Audiotape: Trial conducted 3/8/10 at 9:23:04 - 9:39:03 (on file with Court).  Although she could not recall precisely, Mrs. Crumley testified that she could have used the names "Jennifer Jascott" or "Jennifer Jascott Crumley" within the eight years prior to the petition date, and that she could also have been known during that time period as "Jen Jascott" or "Jen Jascott Crumley."  *Id.*  Mrs. Crumley's separate bank account, which she held prior to her marriage, still listed her maiden name, and the Debtors' accounts with Ameriprise showed her name as "Jennifer Jascott Crumley."  *Id.*; Pl.'s Ex. 20 & 47. At trial, Benchmark also introduced a 2007 statement of mortgage interest paid to CitiMortgage that lists the name "Jennifer L. Jascott," but Mrs. Crumley denied that she had ever seen the document before and asserted that she had no knowledge of the loan that it referenced.  Pl.'s Ex. 43, at CRUMLEY02886; Audiotape: Trial conducted 3/8/10 at 9:37:46 - 9:39:03 (on file with Court).

The Court finds that Benchmark has met its burden to show by a preponderance of the evidence that Mrs. Crumley used another name in the eight years prior to the petition date that was not disclosed.  Because the accuracy of names used in the applicable time period is important to aid the trustee or creditors to identify property or transactions, such an omission is material.  *In re Quiepo*, No. 06-1916-BKC-LMI, 2007 WL 917248, at *5 (Bankr. S.D. Fla. Mar. 23, 2007) (citing

*Tighe v. Valencia (In re Guadarrama)*, 284 B.R. 463, 473 (C.D. Cal. 2002)); *see also Torgenrud v. Schmitz (In re Schmitz)*, 224 B.R. 149, 151 (Bankr. D. Mont. 1999).

(ii)  In response to item 9 on Schedule B, the Debtors listed two life insurance polices through Ameriprise valued at $4,913.04 and $1,940.38, for a total value of $6,853.42.  These values represent the cash surrender value of the policies as of December 31, 2008.  *See* Pl.'s Ex. 47, at CRUMLEY05497 and CRUMLEY05509.  Both policies are variable universal life insurance policies that comprise a portfolio of investments.  *See* Pl.'s Ex. 47, at CRUMLEY05497-CRUMLEY05498; CRUMLEY05509-CRUMLEY05510.  Benchmark argues that the Debtors should have listed these policies on Schedule B for the aggregate market value of those underlying securities, rather than for their cash surrender value.  *See, e.g.*, Audiotape: Trial conducted 3/8/10 at 4:30:43 - 4:51:30 (on file with Court).

This argument is without merit.  The proper valuation of an insurance policy is the amount of funds immediately available to the debtor or the trustee, which is the surrender or termination value.  *See In re Swift*, 124 B.R. 475, 486 (Bankr. W.D. Tex. 1991) (Clark, J.); *see also In re Mitchell*, No. 4:03-CV-581-A, 2003 WL 22016948, at *2 (N.D. Tex. July 28, 2003), *aff'd* 102 F. App'x 860 (5th Cir. 2004) (unpublished opinion) (failure to disclose cash surrender value of life insurance policy was false oath).

(iii)  The Debtors failed to list a laptop computer that Mr. Crumley purchased in 2008 on Schedule B, paragraph 4.  Audiotape: Trial conducted 3/8/10 at 2:42:29 - 2:45:23 (on file with Court); Pl.'s Ex. 1, at 2.  Omissions of assets, even those of little or no value, are material.  *In re Guenther*, 333 B.R. at 638.

(iv) The Debtors did not schedule loans taken out against the Debtors' life insurance policies on Schedule F. Audiotape: Trial conducted 3/8/10 at 3:15:18 -3:15:34 (on file with Court); Pl.'s Ex. 1, at 15-17. Mr. Crumley testified that he did not schedule these loans since he viewed them as loans owed to himself, rather than to Ameriprise. Audiotape: Trial conducted 3/8/10 at 3:15:18 -3:15:34 (on file with Court). While this may be true in practical terms, the Debtors' duty of disclosure is designed to allow creditors to determine for themselves whether items of the estate will benefit or prejudice them. *See In re Guenther*, 333 B.R. at 768; *see also* Joan E. Boros & W. Randolph Thompson, *A Vocabulary of Variable Insurance Products*, 813 Practising Law Inst., Commercial Law and Practice Course Handbook Series, 38 (2001) (discussing practical aspects of policy loans on variable universal life insurance policies). Because these loans directly identify proceeds accessed by the Debtors, this omission was material. *In re Beaubouef*, 966 F.2d at 178.

(v) Item 21 of Schedule B requires disclosure of miscellaneous contingent and unliquidated claims. In response, the Debtors listed only their anticipated 2008 tax refund. Pl.'s Ex. 1, at 5. At trial, however, Benchmark presented evidence of a potential claim against Knox Custom Homes for approximately $120,000.00 in connection with the Preston Shire Property, which Mr. Crumley did not list because Doug Hall ("Hall"), the principal of Knox Custom Homes, had filed for bankruptcy. Audiotape: Trial conducted 3/8/10 at 3:13:06 -3:13:15 (on file with Court); Pl.'s Ex. 54 (Mr. Crumley deposition), at 83:1- 84:5. However, Hall's bankruptcy filing is irrelevant to the Debtors' claim against Knox Custom Homes, a separate legal entity. Moreover, the claim should have been disclosed notwithstanding Mr. Crumley's concerns over its value. The failure to disclose this asset was material. *In re Beaubouef*, 966 F.2d at 178.

(vi) In Schedule J, the Debtors failed to include the second mortgage on their home and their regular life insurance payment in the estimate of their average or projected monthly expenses. Audiotape: Trial conducted 3/8/10 at 11:33:54 - 11:36:15 (on file with Court); Pl.'s Ex. 1, at 20. Similarly, in the means test calculation of current monthly income for Form B22A, the Debtors did not include any of the gifts received from Mr. Crumley's father in the six months prior to filing the petition.[10] Audiotape: Trial conducted 3/8/10 at 1:47:58 - 1:50:32 (on file with Court); Pl.'s Ex. 4, at 2. As stated above, omissions and misstatements of income and expenses are material. *In re Beaubouef*, 966 F.2d at 178.

(vii) The Debtors did not disclose an unexpired lease on a 2005 Highlander on Schedule G, although the Debtors did list this lease on Schedule F, and on Official Forms 8 and 22A. Audiotape: Trial conducted 3/10/10 at 9:52:50 -9:55:14 (on file with Court); Pl.'s Ex. 1, at 16-17; Pl.'s Ex. 3, at 7; Pl.'s Ex. 4, at 9. Although a false answer to one question is not cured by providing true information in another portion of the schedules, *see Cadle Company v. Mitchell (In re Mitchell)*, 102 Fed. App'x 860 (5th Cir. 2004) (unpublished case), the Court finds that the disclosure of this lease in a number of other places in the Debtors' schedules rendered this single omission immaterial, in that it could have provided no additional aid to creditors or the trustee. *Guadarrama*, 284 B.R. at 473-75 (materiality judged by the effect the information is capable of producing).

### c. Discovery Response by Mrs. Crumley

Mrs. Crumley responded to an interrogatory during discovery that her bankruptcy filing was necessitated by "a significant reduction in [her] income over the past five (5) or six (6) years

---

[10] The Code defines "current monthly income" to include income "from all sources that the debtor (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income ..." 11 U.S.C. § 101(10A)(A).

culminating with a gross income for the calendar year of 2008 of approximately $48,000.00" and by the "situation surrounding [her] real property investment" in the Preston Shire Property.  Pl.'s Ex. 8, at 3. This answer was identical to that of Mr. Crumley to the same interrogatory posed to him separately.  Pl.'s Ex. 7, at 3.  At trial, Mrs. Crumley testified that she personally did not make a gross income of $48,000.00 in 2008, and that she was not involved in any of her husband's real estate investments.  Audiotape:  Trial conducted 3/8/10 at 10:41:44 -10:43:59 (on file with Court).

Because Texas is a community property state, all property acquired during marriage is community property, including salaries and wages earned by either spouse, and thus it is questionable whether Mrs. Crumley's interrogatory answers were objectively false.  *See Williams v. Williams*, 246 S.W.3d 207, 212 (Tex. App. 2007).  The Court need not decide falsity, however, since even assuming falsity, Mrs. Crumley's interrogatory answers in this regard are not material in the context of § 727(a)(4)(A), in that this misstatement (to the extent that it is incorrect) had no potential to aid creditors to discover assets, business dealings, or transactions of the Debtors.  *In re Beaubouef*, 966 F.2d at 178.  Erroneously including assets that are ultimately found not to belong to the estate is not a material misstatement.  *Scheidelman v. Henderson (In re Henderson)*, No. 09-80035, 2010 WL 411097, at *11 (Bankr. N.D.N.Y. Jan. 27, 2010).   Thus, it follows that misstatements that inadvertently overstate assets or attribute joint ownership among debtors where none exists are also immaterial.

After considering Benchmark's allegations, the Debtors' material false statements or omissions are thus summarized as failures to disclose or list: (i) Mr. Crumley's interests in Crumley Hall Investments and the informal business agreement with Mr. Crumley, Sr.; (ii) the identity of D.L. Long as an accountant; (iii) certain items of income, such as gifts from Mr. Crumley, Sr., interest

income from Benchmark, and withdrawals from custodial accounts; (iv) a $5,000.00 loan from

Inkman; (v) certain items of monthly household expenses on the schedules; (vi) names used by Mrs.

Crumley in the eight years prior to the filing of the petition; (vii) one laptop computer; (viii) loans

taken against life insurance policies; and (ix) a potential claim against Knox Custom Homes.

### 2.    Knowledge of Falsity

Knowledge of falsity may be demonstrated by circumstantial evidence, and by direct

evidence where the debtors had knowledge of their current and former business affairs. *See In re

Peres*, No. 05-3768, 2007 WL 2766776, *6 (Bankr. N.D. Tex. Sept. 18, 2007). Here, Mr. Crumley

certainly had knowledge of all of the assets, obligations, and transactions at issue. Accordingly,

Benchmark has established this element of its claim as to Mr. Crumley for each of the categories of

material false statements listed above.

The same is not true for Mrs. Crumley, however. First, Mr. Crumley testified that he

prepared most of the schedules relating to monthly income and expense, rather than Mrs. Crumley.

Audiotape: Trial conducted 3/8/10 at 1:52:00 - 1:52:08 (on file with Court). Although apparently only

Mr. Crumley dealt directly with D.L. Long, Mrs. Crumley knew that the Debtors used an accountant.

*See* Audiotape: Trial conducted 3/8/10 at 10:45:13 - 10:47:02 (on file with Court) (Mrs. Crumley's

testimony that she gave all her 2008 tax information to Mr. Crumley, who took that information "to

the CPA."). Other than the fact that she had life insurance, Mrs. Crumley knew almost nothing about

the Ameriprise accounts, including the existence of the custodial accounts for the children.

Audiotape: Trial conducted 3/8/10 at 9:46:01 -9:47:05 (on file with Court). Mrs. Crumley had no

knowledge of the amount of the Debtors' regular monthly payments for their second lien or their life

insurance. Further, although she was generally aware that Mr. Crumley had a partnership with Knox

Custom Homes, Mrs. Crumley knew nothing of the loan from Inkman or any business arrangement between Mr. Crumley and Mr. Crumley, Sr., and was unaware of any gifts from Mr. Crumley, Sr. other than those made in December 2008 and January 2009. Audiotape: Trial conducted 3/8/10 at 10:09:36 - 10:20:04 (on file with Court). Lastly, although it would certainly seem odd for Mrs. Crumley not to have known about her husband's laptop computer, because Mrs. Crumley was never questioned on this point, there is no evidence in the record that she knew of the laptop or the failure to disclose it. *See* Pl.'s Ex. 55 (Mrs. Crumley deposition) and Audiotape: Trial conducted 3/8/10 at 9:20:53 - 11:01:01 (on file with Court).

Thus, as to Mrs. Crumley, Benchmark has established knowledge of falsity only for the failure to disclose: (i) the existence of Crumley Hall Investments; (ii) Mrs. Crumley's maiden name; (iii) gifts received from Mr. Crumley, Sr. in December 2008 and January 2009; and (iv) the identity of the Debtors' accountant.

### 3. Fraudulent Intent

Fraudulent intent may be demonstrated through actual evidence of intent to defraud, or through the cumulative effect of a large number of falsehoods in a debtor's schedules as evidence of a reckless disregard for the truth. *Sholdra*, 249 F.3d at 383. Here, the Court had the opportunity to observe Mr. and Mrs. Crumley throughout one and a half days of trial, and to consider their demeanor and credibility as witnesses as they were questioned at length by counsel for Benchmark. The Court is satisfied that the Debtors possessed no actual intent to defraud, delay, or hinder their creditors, and that the errors and omissions in their petition and schedules were the result of mistakes and inadvertence. The inconsistencies in their testimony appeared to result from relying upon memory, rather than on records, on the part of Mr. Crumley, and from a general lack of knowledge

about the family finances by Mrs. Crumley. Bluntly, the Debtors (in particular Mr. Crumley, despite his profession) appeared to have taken a careless approach to many of their financial dealings and to the preparation of their bankruptcy-related documents. Thus, any fraudulent intent in this case must be demonstrated through a reckless disregard for the truth.

The denial of a discharge is one of the harshest and most punitive sanctions in bankruptcy, and must not be undertaken lightly. *Washington 1993, Inc. v. Hudson (In re Hudson)*, 420 B.R. 73, 100 (Bankr. N.D.N.Y. 2009) (describing denial of discharge as the "death penalty" of bankruptcy). Further, because "[i]t may be close to impossible to produce Schedules and SOFAs that contain no mistaken information," other bankruptcy courts of this district have declined to simply total up a certain number of mistakes in order to derive fraudulent intent. *Neary v. Jordan (In re Jordan)*, 364 B.R. 634, 638-39 (Bankr. N.D. Tex. 2007) (quoting *In re Guenther*, 333 B.R. at 767-68 and discussing *Pratt* and *In re Hughes*, 354 B.R. 801, 812 (Bankr. N.D. Tex. 2006)). The Court will similarly decline in this Case. Benchmark's scattershot approach to its false oaths claim identified a number of errors and inconsistencies, but the particular pattern that mistakes in the statements and schedules display is far more important than their number to establish reckless disregard. *See, e.g., In re Guenther*, 333 B.R. at 767.

With regard to Mr. Crumley, even leaving aside the issue of certain unusual items of income,[11] this pattern is a troubling series of misstatements and omissions committed through outright inattention and carelessness. A debtor's paramount duty is to carefully consider all of the questions posed on the petition, schedules, and statements, and to verify that all information listed is correct. *Morton v. Dreyer (In re Dreyer)*, 127 B.R. 587, 593-94 (Bankr. N.D. Tex. 1991). The

---

[11] This includes, in particular, the number of gifts made by Mr. Crumley, Sr. and withdrawals from custodial accounts devoted to the Preston Shire Property and living expenses.

**Memorandum Opinion**                                                                                    **23**

record reveals that Mr. Crumley did not fulfill that duty in this case. For example, Mr. Crumley testified that in preparing the schedules, rather than reviewing his past bank statements to gauge average monthly income and expenses, he simply used a "best guesstimate" figure. *See, e.g.*, Audiotape: Trial conducted 3/8/10 at 1:52:00 - 1:53:53 (on file with Court). The failure to accurately list other items, such as interest income, a laptop computer, custodial accounts that contained less than $100, and a vehicle lease, while individually of perhaps little significance, only clarify this pattern. Further, Mr. Crumley admitted that he had never attempted to identify and reconcile all of his sources of income prior to trial. This admission highlights the very purpose of the standard required by § 727(a)(4): to ensure that debtors provide all relevant information without the need for lengthy examinations and investigations into the affairs of the estate. *See Oldendorf v. Buckman*, 173 B.R. 99, 104 (E.D. La. 1994). Thus, the totality of the facts presented here compels the Court to find that Mr. Crumley acted with reckless disregard for the truth; and thus, the Court concludes that Mr. Crumley acted with requisite intent under § 727(a)(4).

The same pattern is not present, however, with regard to Mrs. Crumley. As discussed above, Mrs. Crumley appeared to have very little involvement in, or knowledge of, the Debtors' financial affairs. While it is not uncommon (though perhaps less so today than in past years) for one spouse to have primary responsibility for, and knowledge of, family finances, Mrs. Crumley still had a serious obligation to better educate herself in this regard before swearing to statements under oath. *See, e.g., In re Hughes*, 353 B.R. 486, 505 (Bankr. N.D. Tex. 2006). Similarly, Mrs. Crumley should have taken better care to review the petition and schedules for errors and omissions that were within her knowledge, such as the failure to disclose the identity of the Debtors' accountant. Mistakes and naivete, however, do not always equal fraudulent intent. *In re Jordan*, 364 B.R. at 639. The most

significant misstatement attributable directly to Mrs. Crumley is the failure to list her maiden name on the petition. Unlike other cases of similar omissions, however, where the failure to provide a maiden or married name was designed to conceal significant assets or transfers, *see, e.g., In re Quiepo*, 2007 WL 917248 at *5 and *In re Schmitz*, 224 B.R. at 151, here this omission appears to have been a good faith error. *See* pp. 16-17 *supra* (only asset held in maiden name was one bank account opened prior to marriage, which was disclosed). Thus, the Court finds that Benchmark has failed to demonstrate that Mrs. Crumley acted with requisite intent to bar her discharge under § 727(a)(4)(A).

Accordingly, the Court finds that Benchmark has satisfied its burden of proof regarding its § 727(a)(4)(A) claim against Mr. Crumley. With regard to Mrs. Crumley, however, the Court finds no grounds to bar her discharge under § 727(a)(4)(A).

### B.    11 U.S.C. § 727(a)(2)(B)

Section 727(a)(2)(B) provides that a discharge should be denied if the debtor, with intent to hinder, delay, or defraud a creditor, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed property of the estate, after the date of the filing of the petition. Thus, the creditor has the burden to demonstrate: (i) a transfer or concealment of property; (ii) belonging to the estate; (iii) after the date of the petition; and (iv) intent to hinder, delay, or defraud a creditor or officer of the estate. *In re Harwood,* 404 B.R. 366, 384 (Bankr. E.D. Tex. 2009). Section 727(a)(2)(B) requires actual intent by the debtor to hinder, delay or defraud his or her creditors. *In re Powers*, 112 B.R. 184, 187 (Bankr. S.D. Tex. 1989) (citing *Rader v. Lichtenthal*, 306 F.2d 195 (2d Cir. 1962); *In re Baughman*, 58 B.R. 967 (Bankr. S.D.Tex. 1986) and *In re Chastant*, 873 F.2d 89 (5th Cir. 1989)).

Benchmark argues that the Debtors should have disclosed the underlying securities that comprised the Debtors' life insurance policies rather than the cash surrender values of the policies, and that the Debtors' failure to do so constitutes concealment of assets of the estate. *See, e.g.*, Audiotape: Trial conducted 3/8/10 at 4:30:33 - 4:51:30 (on file with Court). Specifically, Benchmark asserts that these underlying securities are assets of the estate because the Debtors only claimed as exempt the cash surrender values, rather than the value of the securities. Audiotape: Trial conducted 3/8/10 at 4:38:36 - 4:39:33 (on file with Court); *see* Pl.'s Ex. 1, at 7.

This argument is without merit. The Debtors fully disclosed the life insurance policies at their proper values on Schedule B. *See Swift*, 124 B.R. at 486. Benchmark presented no evidence that the Debtors held any true ownership in the securities underlying the policies, rather than simply the right under the policy to direct the investment allocation of their premiums. *See Araujo v. John Hancock Life Ins. Co.*, 206 F.Supp.2d 377, 379 (E.D.N.Y. 2002) (describing variable universal life insurance policies).

Benchmark also asserted that the life insurance policies were "unusual" and that the Debtors had provided little assistance in helping Benchmark determine how the accounts worked. Audiotape: Trial conducted 3/8/10 at 4:44:52 - 4:45:26 (on file with Court). According to Benchmark, this failure to assist was a "concealment."

The Court rejects this argument as well. In short, there was no concealment of property. The Debtors were under no duty to tutor Benchmark in the mechanics of their insurance policies. Variable universal life insurance policies are fairly common insurance products that have been widely marketed for some time. *See Bussie v. Allmerica Fin. Corp.*, 50 F.Supp.2d 59, 77 (D.

Mass. 1999) (explaining basic features of variable universal life insurance policies). The Debtors disclosed the existence of the policies, which is all they were required to do.

Accordingly, Benchmark has failed to demonstrate that the Debtors concealed any property of the estate, at any time, and certainly not after the date of the petition. Further, Benchmark has failed to establish actual intent to hinder, delay, or defraud creditors. The Court finds no grounds to deny the Debtors' discharge under § 727(a)(2)(B).

**C.    11 U.S.C. § 727(a)(3)**

Section 727(a)(3) provides that the court should deny discharge if the debtor "has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." The plaintiff bears the initial burden of proving that the debtor's financial records are inadequate and that this failure prevented the plaintiff from ascertaining the debtor's financial condition. *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 703 (5th Cir. 2003). Although a debtor's financial records need not contain full detail, there should be written evidence of the debtor's financial condition. *Id*. The basic criteria for adequacy of records is that the records "must at least allow for reconstruction of the debtor's financial condition." *Pher Partners v. Womble (In re Womble)*, 289 B.R. 836, 856 (Bankr. N.D. Tex. 2003) (quoting *WTHW Inv. Builders v. Dias (In re Dias)*, 95 B.R. 419, 422 (Bankr. N.D. Tex. 1988)). Only if the plaintiff meets its burden to demonstrate that records are inadequate does the burden shift to the debtors to show that the inadequacy is justified under all of the circumstances. *In re Dennis,* 330 F.3d at 703.

Benchmark argues that discharge should be denied because the Debtors failed to keep records of the particular sources of deposits into Mr. Crumley's checking account. Certainly, there are instances where bare bank statements, checks, and deposit slips have been found inadequate to allow creditors to ascertain the debtor's financial condition. *See, e.g., Union Planters Bank N.A. v. Connors*, 283 F.3d 896, 900 (7th Cir.2002) ("Providing the court with a stack of cancelled checks and deposit account statements simply does not meet their burden under § 727; it does not give [creditors] sufficient information to trace their financial history or to reconstruct their transactions."); *In re Juzwiak*, 89 F.3d 424, 428 (7th Cir. 1996); *In re Womble*, 289 B.R. at 856-59 (where debtor presented the court with a "spaghetti" of transactions intertwined between numerous entities).

Here, however, that is not the case. The Debtors produced not only their bank statements, but also tax returns (with work papers) and numerous records of their investment accounts with Ameriprise, which held the bulk of the Debtors' assets. *See* Pl.'s Exs. 31; 32; 33; 34; 35; 43; 45; 46; 47; 48; 49; *accord* Audiotape: Trial conducted 3/8/10 at 2:05:50 - 2:05:58 (on file with Court) (accounts with Ameriprise represented "by far the greatest single repository" of the Debtors' assets over the last several years). Because of this, many of the deposits highlighted by Benchmark at trial are easily traceable not only to the Ameriprise assets in general, but also to specific asset accounts. *Compare, e.g.*, Pl.'s Ex. 56, at CRUMLEY04758 (August 27, 2008 deposit) *with* Pl.'s Ex. 50, at CRUMLEY05491 (account number of Ameriprise One Financial Account corresponds to bank statement deposit notation); Pl.'s Ex. 56, at CRUMLEY04688 (January 14, 2008 deposit) *with* Pl.'s Ex. 50, at CRUMLEY05491 (account number of IRA for Mr. Crumley corresponds to bank statement deposit notation).

As noted previously, however, Mr. Crumley's 2008 bank statements also show $84,248.12 of deposits for which there is no description; and these deposits form the basis of Benchmark's claim of inadequate records. While it would have been helpful if Mr. Crumley had documented the source of the deposits when they were made, the Court is satisfied by his explanation at trial–*i.e.*, that these deposits either originated from withdrawals from the Ameriprise accounts received as checks rather than wire transfers or were gifts from his father. In sum, Benchmark has simply failed to show, by a preponderance of the evidence, that the lack of documentation for these specific deposits prevented Benchmark from ascertaining the Debtors' financial condition. To the contrary, the Debtors' financial condition is readily apparent: over a two-year period, the Debtors exhausted significant resources, including their own retirement funds and their childrens' savings, in an ultimately futile attempt to save the Preston Shire Property and to support a level of personal spending that Mr. Crumley's reduced income could no longer sustain.[12]

Accordingly, the Court concludes that no grounds were proven to deny the Debtors' discharge pursuant to 11 U.S.C. § 727(a)(3).

### D.    11 U.S.C. § 727(a)(5)

Section 727(a)(5) provides that "[t]he court shall grant the debtor a discharge unless ... the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." The objecting creditor bears the initial burden to produce some evidence of the disappearance of substantial assets

---

[12]  At trial, for example, Benchmark demonstrated in detail Mr. Crumley's personal spending on entertainment in the month that the petition was filed, on information gleaned solely from the face of Mr. Crumley's bank statements. Audiotape: Trial conducted 3/8/10 at 1:58:02 - 2:00:24 (on file with Court); Pl.'s Ex. 12.

or of unusual transactions to establish a § 727(a)(5) claim. *In re Reed*, 700 F.2d 986, 993 (5th Cir. 1983) (creditor demonstrated disappearance of $19,586.83 in cash); *see also Powers v. Ottoson-King (In re Ottoson-King)*, 3 F. App'x 147, 151 (4th Cir. 2001) (unpublished opinion) (creditor demonstrated that assets listed on prior financial statement were not listed on debtor's schedules). The mere allegation that the debtor has failed to explain losses is insufficient; instead, the creditor must establish a prima facie case of loss or unusual transactions to shift the burden to the debtor to provide a satisfactory explanation. *In re Claybrook*, 385 B.R. 842, 852-53 (Bankr. E.D. Tex. 2008). What constitutes a satisfactory explanation has not been definitively defined, but a lack of wisdom in the debtor's expenditures, standing alone, is not grounds for denial of a discharge. *In re Sauntry*, 390 B.R. 848, 857 (Bankr. E.D. Tex. 2008). The proper focus under § 727(a)(5) is on the credibility of the proffered explanation rather than the propriety of the disposition of the assets, and an explanation need not even be meritorious to be satisfactory. *In re Guillet*, 398 B.R. 869, 890 (Bankr. E.D. Tex. 2008).

Here, Benchmark relies on the significant withdrawals from the Debtors' Ameriprise accounts over time, and has thus offered sufficient evidence of loss. *See In re Anderson*, 350 B.R. 803, 810 (Bankr. S.D. Ill. 2006) (cash withdrawal of $12,500.00 from credit union account constituted prima facie evidence of loss). Benchmark has offered no evidence, however, to refute the Debtors' explanation that they expended roughly $230,000.00 of their savings on the Preston Shire Property from 2007 until the time of their bankruptcy filing, and that withdrawals from their Ameriprise accounts were spent on trying to save the Preston Shire Property or on their living expenses. *See, e.g.*, Audiotape: Trial conducted 3/8/10 at 3:21:03 - 3:21:25 (on file with Court).

Although significant unpaid liabilities existed at the time of their bankruptcy filing, the Court is satisfied with the Debtors' explanation of the loss in value of their Ameriprise accounts. Thus, the Court concludes that no grounds exist to deny the Debtors' discharge under 11 U.S.C. § 727(a)(5).

## III.    CONCLUSION

Having found no grounds to deny discharge pursuant to 11 U.S.C. §§ 727(a)(2)(B), 727(a)(3), 727(a)(4), or 727(a)(5) as to Mrs. Crumley, the Court concludes that she will receive her discharge. Similarly, the Court has found no grounds to deny discharge as to Mr. Crumley pursuant to 11 U.S.C. §§ 727(a)(2)(B), 727(a)(3), or 727(a)(5). However, Benchmark has established all elements of its objection to discharge pursuant to § 727(a)(4)(A) with regard to Mr. Crumley. Thus, the Court will deny Mr. Crumley's discharge pursuant to 11 U.S.C. § 727(a)(4)(A). Sadly, this result could have been avoided by Mr. Crumley if he had simply taken more care in the preparation of the relevant bankruptcy documents.

A judgment consistent with this Memorandum Opinion will be entered separately.

### ### End of Memorandum Opinion ###